In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-2259

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KASHAWN MORROW,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cr-00062-RLY-DML-1 — **Richard L. Young**, *Judge.*

———————————

ARGUED MAY 19, 2021 — DECIDED JULY 23, 2021

———————————

Before WOOD, ST. EVE, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Kashawn Morrow and several co-defendants participated in a string of four robberies over a two-month span in 2017. The first three robberies targeted various electronics stores in Indiana, and the fourth an electronics store in Ohio. As Morrow and his co-defendants attempted to make their getaway from Ohio to Indiana following the fourth robbery, they were stopped and arrested by federal law enforcement agents. As Morrow later learned,

law enforcement was tracking his movements—based on information gleaned from the first three robberies—and was waiting for the right moment to intervene. Following the arrest, law enforcement was able to recover the electronics from the fourth robbery but not the other three. Morrow also confessed to his role in the robberies and was later charged in a nine-count indictment: three counts of Hobbs Act robbery (the Indiana robberies), three counts of use of a firearm in furtherance of a crime of violence (related to the Indiana robberies), one count of conspiracy to commit Hobbs Act robbery (the Ohio robbery), one count of conspiracy to use a firearm in furtherance of a crime of violence, and one count of transporting a firearm across state lines.

Morrow proceeded to trial on all counts. He admitted guilt on each charge except for the three use-of-a-firearm counts related to the three Indiana robberies, asserting that a fake firearm, not a real one, was used.[1] The jury found Morrow guilty on all counts. At sentencing, the district court imposed a 204-month-and-one-day term of imprisonment and ordered monetary restitution equal to the value of the electronics stolen in all four robberies.

On appeal, Morrow reprises his argument that a fake gun was used in the first two robberies, undermining the sufficiency of the government's evidence on the two use-of-a-firearm counts related to the first two Indiana robberies. He also argues that the government improperly used the Hobbs

----

[1] Morrow now abandons his challenge to the use-of-a-firearm count related to the third Indiana robbery because, as we explain below, he "grabbed the store employee's pistol, which was a real firearm," during that robbery. Appellant's Br. at 23 n.11.

Act conspiracy charge as a predicate for the conspiracy-to-use-a firearm-in-furtherance-of-a-crime-of-violence charge; that Hobbs Act robbery is not a crime of violence, invalidating the three counts concerning use of a firearm in furtherance of a crime of violence; and that because the government had the electronics from the fourth robbery in its possession at the time of sentencing, the district court erred in ordering monetary restitution for those stolen goods. For the reasons stated below, we agree with Morrow's restitution argument, but otherwise affirm Morrow's convictions and sentence.

I

A

Kashawn Morrow's robbery spree began on February 19, 2017. He and co-defendant Christopher Davis drove to a Sprint cellular store in Indianapolis. While Davis waited in the car, Morrow entered the store unarmed and spoke with the store's employee, Samantha Brougham. Morrow then left the store and got back into the car with Davis. Moments later, Davis entered the store. He locked the door, approached Brougham while pointing a gun at her, and forced her to open the store's back room. Davis then held Brougham at gunpoint in the back room and ordered another employee, Tristan Weddington, to put various electronic devices into a backpack Davis had with him. Backpack in hand, Davis exited the store and rejoined Morrow in their car to flee the scene.

Nine days later, on February 27, Morrow and Davis robbed a Radio Shack/Sprint cellular store in Indianapolis using a strategy similar to the February 19 robbery. After the pair arrived, Morrow got out of the vehicle and entered the store to talk to one of the employees on duty, Josiah Norton.

Morrow then left the store and returned to his vehicle; Davis entered, locking the door and pointing a gun at Norton and another employee, Maleek.[2] Pressing the gun to the back of Norton's head, Davis ordered the employees to go to the back room and to fill his backpack with various electronic devices. Davis later exited the store with the backpack, fleeing with Morrow in the waiting vehicle.

On March 4, Morrow and Davis targeted a Sprint cellular store in Indianapolis. For this robbery, both Morrow and Davis entered the store. Davis was armed with the same gun he used in the first two robberies. Once inside, Morrow and Davis forced several employees into the back room and ordered them to fill two bags with various electronic devices. One of the employees, Paopong Pengthieng, was armed with a pistol. When Morrow and Davis discovered Pengthieng was armed, they tried to wrestle his pistol from him. In the struggle Pengthieng was able to eject the pistol's magazine and fire the weapon once, clearing the chamber and hitting no one. Morrow then took control of the gun and pointed it at Pengtheing. When the struggle concluded, Morrow and Davis took the bags filled with electronics and fled the scene.

Morrow and Davis did not attempt another robbery until March 30. Unbeknownst to them at the time, law enforcement officers from the Indianapolis Metropolitan Police Department and the Federal Bureau of Investigation were actively surveilling the vehicle Morrow and Davis used in the February 19 robbery. For this heist, they were joined by two other accomplices, David McGhee and Darrin Bell. The four drove in two vehicles—one of them the vehicle law enforcement was

---

[2] The parties do not identify Maleek's last name.

surveilling—to Troy, Ohio. After scoping out several electronics shops, the crew settled on robbing a Verizon store. This time McGhee was the first to enter. Once inside he spoke with its only employee, Gerad Jacobs. Morrow, Davis, and Bell then entered the store. Morrow was carrying a .22 caliber Mossberg rifle. The crew forced Jacobs to open the back room and load various electronic devices into a bag. When Jacobs finished, the crew told Jacobs to lie on the ground and threatened him before making their escape.

Their escape, however, was short-lived. Law enforcement stopped both vehicles in Indiana as the men were traveling back to Indianapolis. In the trunk of the vehicles, law enforcement officers discovered the loaded rifle Morrow carried, another loaded handgun, and $61,409.38 worth of electronic devices. Shortly thereafter, Morrow and Davis waived their *Miranda* rights and agreed to speak with the officers. Both confessed that they had committed each of the four robberies described above. Morrow's interviewer, FBI agent Adam Vail, remarked at one point, "Thank God [Davis] didn't fire a shot," to which Morrow replied, "We didn't have no bullets. We don't go in the store with bullets."

Law enforcement thereafter twice searched Morrow's apartment. They did not find a gun of any kind, but they did discover a loaded 9mm Smith and Wesson magazine in Morrow's bedroom dresser. A later search of Davis's cellphone revealed a picture of Davis on a countertop in Morrow's kitchen with a black and silver handgun bearing the Smith and Wesson insignia.

B

Morrow was charged in a nine-count indictment. Counts 1, 3, and 5 charged Morrow with Hobbs Act robbery under 18 U.S.C. § 1951(a) for the February 19, February 27, and March 4 robberies, respectively. Counts 2, 4, and 6 charged Morrow with using or aiding and abetting the use of a firearm during a crime of violence under 18 U.S.C. § 924(c)(1)(A)(ii) and 18 U.S.C. § 2. Each § 924(c) count identified the underlying crime of violence by reference—that is, count 2 referenced the "robbery as charged in" count 1, count 4 referenced count 3, and count 6 referenced count 5. The § 924(c) counts also charged Morrow with brandishing the firearm. The government charged conspiracy to commit Hobbs Act robbery in count 7 concerning the March 30 robbery in Troy, Ohio.[3] In count 8, the government charged Morrow as follows:

> On or about March 30, 2017, **KASHAWN MORROW, CHRISTOPHER DAVIS, DAVID MCGHEE** and **DARRIN BELL**, in the Southern District of Indiana and elsewhere, did conspire to use a firearm during and in relation to a crime of violence for which the person may be prosecuted in a Court of the United States to wit, robbery. In furtherance of that conspiracy, one or more co-conspirators committed the overt acts of casing a cellular phone retail store in Richmond, Indiana, and/or the armed robbery of a cellular phone retail store in Troy, Ohio. All in

---

[3] The government stated at oral argument that it charged Hobbs Act conspiracy rather than the substantive offense because it had venue to charge the former, but not the latter. Morrow does not challenge venue on appeal.

violation of Title 18, United States Code, Section
924(o).

R. 38 at 4. Count 9 charged Morrow with transporting a firearm across state lines intending to commit a felony under 18 U.S.C. § 924(b).

Morrow and Davis proceeded to trial on all counts. At trial, Morrow testified in his defense, conceding his guilt for each of the four robberies. But Morrow challenged counts 2, 4, and 6, the § 924(c) charges related to the February 19, February 27, and March 4 robberies, on two fronts: (1) because he was in the car when Davis was inside the stores, he did not "brandish" a firearm; and (2) because Davis used an Airsoft gun, the government could not meet its burden to prove a "firearm," as defined under § 924(c)(1)(A), was used. The jury agreed with Morrow on the former, finding him not guilty of brandishing a firearm; accordingly, we focus our discussion of the trial evidence on the latter.

We begin with the eyewitness testimony. One of the first robbery's victims, Brougham, was asked whether she "g[o]t a good look at the gun." R. 293 at 54. She responded, "[y]es and no," noted that she "c[ould] distinguish the color," admitted that she was "not very smart with guns," and added: "I can tell you it was a handgun and that it was dark gray." *Id.* at 54. The second victim, Weddington, did not "get a good look at the gun" but believed the gun was real. *Id.* at 62. Norton, one of the second robbery's victims, testified that he saw Davis pull out a semiautomatic handgun as he entered the store and heard the "slide rack." He went on to explain that with "a semiautomatic [handgun] you have to pull the chamber or the rack back to chamber a round." *Id.* at 68–69. On cross-examination, Norton noted that he "grew up in the country"

and "played with a lot of Airsoft guns and stuff," but that the handgun he saw Davis use "didn't look like an Airsoft gun" to him. *Id.* at 80. Another victim, Pengthieng, testified that Davis was holding a semiautomatic handgun and pointed it at him and another store employee. As discussed, Pengthieng had a military background and carried a concealed handgun, and he described in detail the operation of his handgun. He later stated that the handgun Davis displayed looked "real." *Id.* at 96.

Davis introduced an Airsoft gun into evidence that he claimed was the gun he used to commit the first three robberies. Davis's brother recalled seeing Davis with that Airsoft gun, and Davis later introduced several photographs of him allegedly with that gun. Morrow claimed that the Airsoft gun introduced into evidence was his; he gave it to Davis to use in the three robberies because "[i]t would be no harm or danger towards anybody." R. 294 at 210–11.

To prove that the gun was, in fact, a real firearm, the government introduced the cellphone photo of Davis in Morrow's kitchen with a black and silver Smith and Wesson handgun. It also introduced several still photographs from surveillance footage taken during the robberies showing Davis holding a silver and black handgun. The government then introduced the Smith and Wesson 9mm handgun magazine found in Morrow's bedroom dresser. Agent Vail testified that he did not recover an Airsoft gun or any accessories for such a gun during the search of Morrow's residence. He also testified that Morrow did not mention an Airsoft gun during his custodial interview, something that other interviewees generally "tell [him] almost immediately" when a fake gun is used to commit a crime. R. 294 at 101–102, 138–39. Lastly, the government

elicited testimony that the Airsoft gun Davis introduced differed from the gun in the cellphone photo and surveillance footage in barrel color (black instead of silver), the shape of the trigger guard, and the magazine plate.

Agent Vail admitted that he did not have "direct knowledge" that the gun pictured in the photo from Davis's cellphone was the gun used in the robberies. R. 294 at 159–60. And he believed that it was possible to confuse an Airsoft gun with a real firearm. He also stated it was "possible" that Morrow's statement to him in the custodial interview concerning "no bullets" could be construed as Morrow admitting he did not use a real firearm. *Id.* at 160–61.

In closing argument, counsel for Morrow reiterated that Morrow confessed to "commit[ting] four robberies" and that, "at every opportunity when questioned about his role in th[e] robberies, he said he did it. He did so before [the jury]." R. 294 at 279. Counsel continued: "Morrow, he confessed. And to confess, says [sic] admitting that one is guilty of a crime. So the government's [sic] right on Counts 1, 3, 5, 7, 8 and 9. Mr. Morrow confessed to those crimes. Not a lot for you to deal with there." *Id.* at 279–80. Counsel went on to argue the theme developed at trial, that the handgun used in the first three robberies was not a real firearm.

The jury found Morrow guilty on all counts, making a special finding that he only "used" instead of "brandished" the firearm in counts 2, 4, and 6. At sentencing, the district court ticked through the counts of conviction. Several statements the district judge made during the hearing form part of Morrow's attack on his count 8 conviction. First, when recounting the jury verdict, the court stated, "Count 7, conspiracy to affect robbery by commerce …; Count 8, conspiracy to use a

firearm during and in relation to a crime of violence." R. 292 at 2. Later, the district court characterized those offenses thusly: "Count 7 being conspiracy to interfere with commerce by robbery; Count 8[,] conspiring to use a firearm during and in relation *to a robbery charged in Count 7*." *Id.* at 4 (emphasis added). Morrow's presentence investigation report mirrors the court's characterization of count eight. Neither party objected to the report.

Ultimately, the court sentenced Morrow to 204 months' and one day imprisonment. The court also ordered $119,472.58 in total restitution for the four robberies, including $61,409.38 for the fourth, Troy, Ohio robbery. At the time of sentencing, the government still possessed the electronic devices recovered from the fourth robbery.

## II

Morrow raises four arguments on appeal: (1) conspiracy to commit Hobbs Act robbery—as charged in count 7—is not a crime of violence under § 924(c)(3)(A)'s elements clause, and because count 7 was the predicate offense for count 8's § 924(o) charge, count 8 must be vacated; (2) the government failed to meet its burden to prove Davis used a real gun, and not the Airsoft gun introduced at trial, to support Morrow's § 924(c) convictions on counts 2 and 4;[4] (3) Hobbs Act robbery is not a "crime of violence" as that term is defined under § 924(c)(3)(A)'s elements clause, and thus cannot serve as a predicate for the § 924(c) offenses in counts 2, 4, and 6; and (4) the $61,409.38 restitution order concerning the Troy, Ohio robbery was error because the government had in its

---

[4] As we mentioned above, Morrow abandons on appeal his challenge to the § 924(c) charge in count 6.

possession the electronic devices recovered from that robbery at the time of sentencing. We address each argument in turn.

A

Morrow insists that count 7's charge for conspiracy to commit Hobbs Act robbery served as the predicate offense for count 8, conspiracy to commit a § 924(c) offense. In support, he points to the district court's characterization of count 8 at sentencing and the PSR's description of that count—adding that the government failed to object to either characterization—as well as the text and structure of the indictment.

Before reaching the merits, we note two points of agreement. First, the government concedes that conspiracy to commit Hobbs Act robbery is not a crime of violence under § 924(c)(3)(A)'s elements clause. Because of the government's concession, the parties' views on this question are aligned and we assume that position is correct without deciding the issue. Second, Morrow concedes that he did not raise this argument at trial, and the government agrees that it was forfeited. See *United States v. Moody*, 915 F.3d 425, 429 (7th Cir. 2019) ("If the government cannot proffer any strategic justification for a defendant's omission, we will presume an inadvertent forfeiture rather than an intentional relinquishment."). So we review Morrow's argument under the plain error standard. See FED R. CRIM. P. 52(b); *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021).[5]

_____

[5] As discussed above, Morrow admitted his guilt on count 8 before the jury at trial. But that admission does not preclude plain error review of an unpreserved objection to the legal underpinnings of that count. On the contrary, Morrow may press that challenge despite his admissions of guilt at trial. See *Greer*, 141 S. Ct. at 2096 (applying plain error standard when

Under Federal Rule of Criminal Procedure 52(b), we "may" address a "plain error that affects substantial rights … even though it was not brought to the [district] court's attention." FED R. CRIM. P. 52(b). The Supreme Court has interpreted Rule 52(b) as having three "threshold" requirements: (1) "there must be an error;" (2) "the error must be plain;" and (3) "the error must affect 'substantial rights,' which generally means that there must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Greer*, 141 S. Ct. at 2096 (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018)). The defendant bears the burden of establishing that those three requirements are satisfied. See *id.* at 2097. If he does so, we may grant the relief he seeks if we "conclude[] that the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 2096–97 (quoting *Rosales-Mireles*, 138 S. Ct. at 1904–05). The defendant bears the burden on this fourth requirement as well. See *id.* And as the Supreme Court recently reminded litigants, "[s]atisfying all four prongs of the plain-error test is difficult." *Id.* at 2097 (quotation omitted).

We begin with the text of the statute charged in count 8. Section 924(o) of Title 18 proscribes conspiring to commit an offense under § 924(c). Section 924(c)(1)(A), in turn, prohibits using a firearm "during and in relation to any crime of violence … for which the person may be prosecuted." Note the statute's use of "may be"—§ 924(c)(1)(A) does not require "prosecution for or conviction of that other offense" to establish a predicate crime of violence offense. *Davila v. United States*, 843 F.3d 729, 731 (7th Cir. 2016). Rather, "proof of the

defendants challenged convictions after one pleaded guilty and the other admitted element of offense at trial).

predicate [] offense is an element" of a § 924(c) charge that "must be proven beyond a reasonable doubt." *United States v. Freeman*, 815 F.3d 347, 351 (7th Cir. 2016). Stated differently, the defendant "must have committed all of the acts necessary to be subject to punishment for the crime of violence." *United States v. Moore*, 763 F.3d 900, 908 (7th Cir. 2014).

We are skeptical whether the error Morrow identifies is error at all, and even if it was, whether it is "plain." Specifically, the government could have utilized the substantive Hobbs Act robbery—that is, the Troy, Ohio robbery—as the predicate for count 8, see post II.C, and we do not think it "clear" or "obvious" that count 7, instead, served as that predicate. *Rosales-Mireles*, 138 S. Ct. at 1904. As for the former, Morrow admitted repeatedly—in his custodial interview, on the stand at his trial, and in his closing arguments—that he committed the Troy, Ohio robbery. And at oral argument, Morrow conceded that robbery could serve as the predicate for count 8 without the government bringing a formal charge for the substantive offense. Moreover, Morrow admitted his guilt on count 8, and does not dispute that admission on appeal. As for whether count 7 served as the predicate for count 8, the record is decidedly mixed, contrary to Morrow's suggestion, for several reasons. First, counts 2, 4, and 6 (the § 924(c) counts) explicitly identify counts 1, 3, and 5 as the predicate offenses, respectively. Count 8 does not reference count 7; rather, the predicate is identified only as a "robbery." Second, the only "robbery" that occurred on March 30, 2017—the date identified in count eight—was the fourth robbery in Troy, Ohio. Third, the indictment lists, as an overt act, "the armed robbery of a cellular phone retail store in Troy, Ohio." So it appears neither "clear" nor "obvious" that count 7 served as count 8's predicate.

But even assuming Morrow meets the first three threshold requirements, his repeated admissions to committing the Troy, Ohio robbery foreclose finding that the "fairness, integrity or public reputation" were impugned by his conviction on count 8. There is no doubt as to Morrow's full and willing participation in the robbery related to that count—his admission of guilt on appeal is the last of a long line of similar admissions throughout the criminal process. And, as discussed, Morrow also admitted to the jury that he was guilty on count 8. Cf. *United States v. Driver*, 242 F.3d 767, 771 (7th Cir. 2001) (holding that errors in change-of-plea hearing did not affect the "fairness, integrity, or public reputation of judicial proceedings" when defendant "avowed that he was pleading guilty because he [was] guilty" in his plea agreement and "on his feet in court." (quotation omitted)). Finally, Morrow correctly recognizes that the government did not have to charge a substantive offense to establish the predicate offense for count 8. Accordingly, Morrow fails to satisfy the plain error requirements for his conviction on count 8.

B

Morrow next asks us to find the government failed to meet its burden on counts 2 and 4 to prove a "firearm" was used in the first two robberies. He relies primarily on Davis's introduction of an Airsoft gun at trial and his testimony that he gave that gun to Davis to use in those robberies. And he discounts the government's contrary evidence as "tenuous," stressing the relative weakness of the government's case.

Morrow admits that he did not raise this argument at trial in a motion under Federal Rule of Criminal Procedure Rule 29. Accordingly, we review his sufficiency challenge for plain error. See *United States v. Lundberg*, 990 F.3d 1087, 1095 (7th

Cir. 2021). As for sufficiency challenges, we "may overturn a jury verdict for insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id.* In conducting this analysis, we view the evidence holistically and in a light most favorable to the government, resisting attempts to reweigh evidence or reassess credibility. See *United States v. Wallace*, 991 F.3d 810, 812 (7th Cir. 2021); *United States v. Memar*, 906 F.3d 652, 656 (7th Cir. 2018). We have described this standard as "a nearly insurmountable hurdle" when a defendant preserves a sufficiency challenge; when unpreserved, that hurdle is several notches higher. *Lundberg*, 990 F.3d at 1095. Specifically, a defendant must show that the record "is devoid of evidence pointing to guilt, or [that] the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Id.* (quotations omitted).

Morrow's argument focuses on § 924's text, so we begin there. As discussed, § 924(c)(1)(A) prohibits the "use" or "possession" of a firearm "in furtherance of" and "during and in relation to any crime of violence."[6] For purposes of § 924(c), a "firearm" is defined as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." *Id.* § 921(a)(3). When interpreting this definition, we have held that the government must prove that a "real gun" was used, *United States v. Amaya*, 828 F.3d 518, 524 (7th Cir. 2016), not "a replica or toy

---

[6] Section 2 of Title 18, in turn, prohibits a person from aiding or abetting "an offense against the United States" and punishes any such person as a "principal." Morrow does not challenge the government's evidence concerning whether he aided and abetted Davis's use of a firearm in furtherance of the first two Hobbs Act robberies.

gun." *United States v. Lawson*, 810 F.3d 1032, 1039 (7th Cir. 2016).

Several principles may be drawn from our cases confronting sufficiency challenges to a § 924(c) charge's firearm element. First, "the fact that the gun was not produced at trial or that the witnesses did not have an opportunity to examine closely the weapon does not prevent conviction of a firearm offense." *United States v. Buggs*, 904 F.2d 1070, 1076 (7th Cir. 1990). Relatedly, "when a witness can testify that a defendant brandished [or used] a firearm," the government need not introduce the firearm at trial or produce "other corroborating evidence to sustain a conviction." *United States v. Ingram*, 947 F.3d 1021, 1025 (7th Cir. 2020). Moreover, the government does not have to produce "an expert witness or more than one lay witness" to establish that a firearm was used. *Lawson*, 810 F.3d at 1040.

We assume without deciding that Airsoft guns are not "firearms" under § 921(a)(3)'s definition because the government does not argue otherwise. To be sure, we have once before noted—albeit in dicta—that Airsoft guns are "replicas of firearms." See *Gibbs v. Lomas*, 755 F.3d 529, 534 (7th Cir. 2014); see also *United States v. Davis*, 841 F.3d 1253, 1255 n.2 (11th Cir. 2016) (citing *Gibb's* dicta with approval). But because the government does not press the issue, we need not reach it to resolve Morrow's appeal.

Moving to the merits of Morrow's argument, the government's evidence was far from tenuous. Quite the contrary. Recall that the government elicited testimony from four robbery victims concerning the gun they saw during the robberies; introduced a photo from Davis's phone showing a silver and black Smith and Wesson handgun; elicited testimony that the

trigger guard, gun color, and base plate of the Airsoft gun differed from the gun in that photo; introduced surveillance footage that appears to show a silver and black handgun; recovered and introduced a 9mm Smith and Wesson magazine from Morrow's bedroom; elicited testimony that law enforcement did not find an Airsoft gun or Airsoft gun accessories in the search of Morrow's residence; and elicited testimony that neither Morrow nor Davis told agents in their custodial interviews that they used a fake gun. We have affirmed § 924(c) convictions on far less. See *Amaya*, 828 F.3d at 524; *Lawson*, 810 F.3d at 1039.

Moreover, Morrow's arguments fail to persuade. He attempts either to discount the strength of the government's evidence or to offer alternate explanations of that evidence—in other words, Morrow invites us to step into the jury's shoes to weigh the relative merits of the prosecution's case. That we cannot do. See *Wallace*, 991 F.3d at 812. And to the extent Morrow attempts to pick apart the government's evidence piece by piece, his efforts are inconsistent with our review of sufficiency challenges. See *Memar*, 906 F.3d at 656; see also *United States v. Farmer*, 717 F.3d 559, 563 (7th Cir. 2013) ("The jury's duty was to consider the entire record as presented at trial; it was not required to consider whether or not one piece of evidence in isolation supported a guilty verdict."). In sum, Morrow fails to demonstrate plain error concerning his sufficiency challenge to counts 2 and 4.

C

Like many defendants before him, Morrow asks us to hold that Hobbs Act robbery is not a "crime of violence" under § 924(c)(3)(A)'s elements clause. Morrow recognizes that our precedent forecloses this argument. But he hopes to preserve

the issue for reconsideration, focusing on an unpublished decision from the Northern District of California that he believes "call[s] [our] precedent into question." Appellant's Br. at 21; see *United States v. Chea*, No. 98-cr-2000-1, 2019 WL 5061085 (N.D. Cal. Oct. 2, 2019).

As Morrow admittedly recognizes, "we have held time and again that Hobbs Act robbery qualifies as a crime of violence under the elements clause … because it entails the use or threat of force." *United States v. McHaney*, 1 F.4th 489, 491 (7th Cir. 2021). And as we noted in *McHaney*, all our sister circuits agree. *Id.* at 492. This includes the Ninth Circuit. In a decision issued after *Chea*, the Ninth Circuit in *United States v. Dominguez* "reiterate[d]" that "Hobbs Act armed robbery is a crime of violence for purposes of 18 U.S.C. § 924(c)(3)(A)." 954 F.3d 1251, 1255 (9th Cir. 2020). Morrow does not attempt to square *Chea* with *Dominguez*, and we are not sure how those two cases can be read together. In any event, we need not adopt the reasoning of an out-of-circuit case when binding circuit precedent resolves the issue. See *United States v. Adams*, 934 F.3d 720, 729 (7th Cir. 2019). So we decline Morrow's invitation to do so, and reaffirm once again our long, unbroken line of precedents resolving this question against him.

D

Finally, Morrow argues that the district court plainly erred when it ordered him to pay $61,409.38 for the property stolen—and later recovered by the government—in the Troy, Ohio robbery. The government concedes this error; at oral argument, the government admitted that the stolen property was in the government's possession when Morrow was sentenced.

When a victim suffers a loss of property due to defendant's offense, as with Hobbs Act robbery, a district court ordinarily must order the defendant "to return the property to the owner of the property or someone designated by the owner." 18 U.S.C. § 3663A(b)(1)(A). But if returning the stolen property is "impossible, impracticable, or inadequate," the court must instead order that defendant pay some amount to compensate for the loss. *Id.* § 3663A(b)(1)(B). In *United States v. Anderson*, we held that the government bears the burden to prove that § 3663A(b)(1)(B), and not § 3663A(b)(1)(A), dictates the restitution award when stolen property remains in the government's possession. 866 F.3d 761, 765 (7th Cir. 2017). We went on to hold that the government's failure to notify the district court that it had possession of certain stolen property at the time of sentencing was an error "obvious under the law"—that is, plain error. *Id.* at 767.

Because the stolen property from the Troy, Ohio robbery was in the government's possession at the time of sentencing, it was error for the district court to order monetary restitution for that property. We pause to note that this error may have been beyond the district court's control—the record is unclear as to whether counsel for the government knew that the government still had the stolen property in its possession at sentencing, and if the government did know, whether the district court was notified. In any event, the government concedes the error now as it did in the appeal of Morrow's co-defendant Davis. See Order, *United States v. Davis*, 19-2256, D.E. 29 (7th Cir. May 29, 2020). Accordingly, we vacate the restitution award related to the Troy, Ohio robbery and remand for the district court to determine in the first instance the appropriate amount of restitution.

                                    *        *        *

In sum, we AFFIRM Morrow's convictions and sentence on counts one through nine, VACATE the restitution award concerning the Troy, Ohio robbery, and REMAND for a determination of the appropriate restitution award for that robbery.[7]

---

[7] The Court thanks Morrow's appointed counsel, Joshua M. Levin and Zachary C. Schauf, both for accepting the appointment and for ably discharging their responsibilities.